**EFiled:  Jul 29 2020 03:09PM EDT**
**Transaction ID 65808983**
**Case No. 2020-0518-PAF**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| FIRST LANDING FUND, LLC and INDIE DIVERSIFIED ABSOLUTE RETURN FUND, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    C.A. No. 2020-0518-PAF ) |
| PROPHECY TRADING ADVISORS GP, LLC, PROPHECY TRADING ADVISORS, LP, PROPHECY SPECIAL OPS GP, LLC, and PROPHECY SPECIAL OPPORTUNITIES FUND, LP, | )    **PUBLIC VERSION** )    **EFILED ON JULY 29, 2020** ) ) ) ) ) |
| Defendants. | ) |

### VERIFIED AMENDED COMPLAINT FOR INSPECTION OF PARTNERSHIP BOOKS AND RECORDS[1]

Plaintiffs First Landing Fund, LLC, a Delaware limited liability company ("First Landing"), and Indie Diversified Absolute Return Fund, LLC, an Indiana limited liability company ("IDARF," together with First Landing, "Plaintiffs"), by and through their attorneys, for their complaint against Defendants Prophecy Trading Advisors GP, LLC, a Delaware limited liability company ("Trading Advisors GP"), Prophecy Trading Advisors, LP, a Delaware limited partnership ("Trading Advisors Fund"), Prophecy Special Ops GP, LLC, a Delaware limited

---

[1]    A redline showing the changes between the Verified Complaint for Inspection of Partnership Books and Records [Dkt. 1] and this Verified Amended Complaint for the Inspection of Partnership Books and Records is attached as Exhibit 1.

liability company ("Special Ops GP"), and Prophecy Special Opportunities Fund, LP, a Delaware limited partnership ("Special Ops Fund") (Trading Advisors GP, Trading Advisors Fund, Special Ops GP and Special Ops Fund are collectively "Prophecy" or "Defendants"), allege as follows on personal knowledge as to each Plaintiff's own actions and on information and belief as to the actions of others:

## NATURE OF THE ACTION

1.      This action, brought pursuant to 6 *Del. C.* § 17-305 ("Section 17-305"), seeks relief in the form of an order compelling Prophecy summarily to make available to Plaintiffs for inspection and copying the books and records demanded. As set forth in greater detail herein, due and proper written requests to the Defendants, both informal and formal, and clearly for a proper purpose, have been made by Plaintiffs and Plaintiffs' counsel. Defendants have substantially refused and/or ignored Plaintiffs demands for inspection and copying.

## PARTIES AND JURISDICTION

2.      First Landing is a Delaware limited liability company with its principal place of business at 3500 Pacific Avenue, Virginia Beach, Virginia 23451. First Landing is a limited partner of Trading Advisors Fund.

3.      IDARF is an Indiana limited liability company with its principal place of business at 10585 North Meridian Street, Suite 210, Indianapolis, Indiana 46290. IDARF is a limited partner of both Trading Advisors Fund and Special Ops Fund.

3

4.      Prophecy GP is a Delaware limited liability company with its principal place of business at 641 Lexington Avenue, 14th Floor, New York, New York 10022.   Trading Advisors GP is the current general partner of Trading Advisors Fund.

5.      Special Ops GP is a Delaware limited liability company with its principal place of business at 641 Lexington Avenue, 13th Floor, New York, New York 10022.  Special Ops GP is the current general partner of Special Ops Fund.

6.      Jurisdiction is proper in this court because Trading Advisors GP and Special Ops GP are Delaware limited liability companies and Trading Advisors Fund and Special Ops Fund are Delaware limited partnerships, and this action seeks relief with respect to Defendants under Section 17-305.  Pursuant to Section 17-305(e), this court has exclusive jurisdiction over the relief sought by Plaintiffs.

## FACTUAL BACKGROUND

A.      The Prophecy Fund and Special Ops Funds

7.      The Trading Advisors Fund and Special Ops Fund (together, the "Prophecy Funds") employ similar structures to meet their respective investment objectives.   Both Funds allocate investors' capital to a group of sub-advisors running a variety of investment strategies.   And both Funds seek consistent absolute returns primarily through capital appreciation while also attempting to preserve capital and mitigate risk.

4

8.     The Trading Advisor Fund allocates fund capital to various "sub-advisors," who, in turn, invest the Funds' assets.

9.     Each Trading Advisor Fund sub-advisor also contributes its own "at-risk capital" in an amount equal to a negotiated percentage of the total net assets initially invested in the sub-advisor's account.  Upon information and belief, such negotiated percentages varied between 10 and 20 percent of the total net allocation to that sub-advisor.

10.     Any losses in a given sub-advisor's account within the Trading Advisors Fund are allocated first to the sub-advisor's at-risk capital before being allocated to the Trading Advisors Fund's investor capital.  To the extent a sub-advisor sustains losses to its at-risk capital, any later investment gains in the sub-advisor's account go toward replenishing the sub-advisor's at-risk capital until it is restored.  In exchange for the protection that this "first loss" arrangement affords investors, the sub-advisor keeps a larger than normal share of any investment gains on the Trading Advisors Fund's platform.

11.     ██████████████████████████████████████████████████ ████████████████████████████████████████████  Upon information and belief, the Trading Advisor Fund has or had policies on concentration and risk limits that were designed to ensure that the Fund's investor capital was allocated to sub-advisors who were pursuing a diverse range of

5

strategies and to avoid concentrating capital with too few sub-advisors.  Further, upon information and belief, the Trading Advisor Fund sub-advisors were subject to fund policies on concentration and risk limits that were designed to ensure that each sub-advisor's investments were not concentrated or illiquid.  The unique structure of employing numerous sub-advisors who directly participate in the investments via their at-risk capital is designed to (1) limit Trading Advisors Fund's investors' downside risks in the event of investment losses; (2) more closely align, via the "first loss arrangement," the sub-advisors' economic interests with those of the Trading Advisors Fund's investors; and (3) diversify Trading Advisors Fund's investors' risk █████████████████████████████████ ████████████████.

12.   The Special Ops Fund also allocated fund capital to various "sub-advisors" to invest the Funds' assets, although the Special Ops Fund has fewer sub-advisors and those sub-advisors were not required to contribute their own "at risk capital."

13.   Upon information and belief, the Special Ops Fund also has or had policies on concentration and risk limits that were designed to ensure that the Special Ops Fund's investor capital was allocated to sub-advisors who were pursuing a diverse range of strategies.  Further, upon information and belief, the Special Ops Fund sub-advisors also were subject to fund policies on concentration

6

and risk limits that were designed to ensure that each sub-advisor's investments were not concentrated or illiquid.

14. Given these structures, the process of vetting, selecting and retaining sub-advisors is critical to the Prophecy Funds' functioning and performance. Prophecy Funds' General Partners and/or Investment Managers, all of which are controlled by Jeffrey Spotts, are responsible for these processes.

15. As described herein, however, one sub-advisor of Prophecy Fund currently faces criminal securities fraud charges, while another sub-advisor is involved in litigation with the Prophecy Fund itself after having the vast majority of Prophecy Fund assets concentrated with him for investment, which were then ██████████ as a result of his mismanagement.

B.    The Limited Partnership Agreements

16. Trading Advisors Fund is governed by the Limited Partnership Agreement, dated August 24, 2011 ("Trading Advisors Fund Partnership Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

17. Under the Trading Advisors Fund Partnership Agreement, Prophecy Trading Advisors GP was designated the general partner of Trading Advisors Fund. Prophecy Trading Advisors GP is owned and managed by Jeffrey Spotts.

18. Pursuant to a Subscription Agreement executed April 24, 2017, First Landing purchased a limited partnership interest and became a limited partner of

7

Prophecy Fund.  First Landing would go on to make further subscriptions.  A true and correct copy of the Subscription Agreement is attached hereto as <u>Exhibit B</u>.

19.    Pursuant to a Subscription Agreement executed June 12, 2019, IDARF purchased a limited partnership interest and became a limited partner of Prophecy Fund and made further subscriptions on December 19, 2019 and January 22, 2020.  A true and correct copy of the Subscription Agreements and additional subscriptions are attached hereto as <u>Exhibit C</u>.

20.    Special Ops Fund is governed by the Amended and Restated Limited Partnership Agreement dated February 1, 2019 ("Special Ops Fund Partnership Agreement"), a true and correct copy of which is attached hereto as <u>Exhibit D</u>.

21.    Under the Special Ops Fund Partnership Agreement, Prophecy Special Ops GP was designated the general partner of Special Ops Fund.  Prophecy Special Ops GP is owned and managed by Jeffrey Spotts.

22.    Pursuant to a Subscription Agreement executed June 12, 2019, IDARF purchased a limited partnership interest and became a limited partner of Special Ops Fund and made further subscriptions on September 17, 2019 and January 22, 2020.  A true and correct copy of the Subscription Agreement and IDARF's additional subscriptions are attached hereto as <u>Exhibit E</u>.

23.     Section 5.04 of both the Prophecy Fund Partnership Agreement and the Special Ops Fund Partnership Agreement, titled "Rights of Limited Partners to Inspect Books, Records, and Partnership Documents," provides:

> Upon reasonable advance notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained under Section 17-305 of the Act and any financial statements maintained by the Partnership.  Any inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner.  Notwithstanding the foregoing, the General Partner in its discretion may limit the information that Limited Partner may obtain pursuant to this **Section 5.04** to the extent such information shall allow a Limited Partner to identify any other Limited Partner.  As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any information concerning the identity of the other Limited Partners, and, to the extent such books and records cannot be so redacted, such books and records may be withheld for inspection to such requesting Limited Partner.  Copies of this Agreement and all amendments hereto shall be furnished to each Limited Partner upon request.

C.     Brenda Smith, a Prophecy Sub-Advisor, is Arrested For Securities Fraud

24.     Brenda Smith, an individual residing in Philadelphia, Pennsylvania and the investment manager of Broad Reach Capital, LP, was, for a period of time, one of the sub-advisors of the Prophecy Fund, and as such she had investment authority over Trading Advisor Fund assets.

9

25.    On August 27, 2019, Brenda Smith was arrested and charged in connection with an alleged $100 million securities fraud scheme.  *See United States of America v. Smith*, 2:19-mj-03377-JBC (D.N.J.).  Ms. Smith was also charged civilly with securities fraud by the Securities and Exchange Commission. *See Securities and Exchange Commission v. Smith,* 2:19-cv-17213-MCA-ESK (D.N.J.).

26.    Brenda Smith currently is incarcerated and awaiting trial.

27.    Plaintiffs learned, from informal conversations with Jeffrey Spotts, that Prophecy Fund maintained positions that were put in place while Brenda Smith was a Prophecy Fund sub-advisor, including as recently as 2018.  According to Spotts, however, investors incurred no losses as a result of Smith's activities.

28.    Specifically, Spotts represented to Plaintiffs that the Smith-related investment position(s) were sold at no loss to *another Prophecy Fund sub-advisor* ("Sub-Advisor #1").  That is, the Smith-related position(s) were disposed of in an internal cross-trade within the Prophecy Funds.

29.    Spotts has refused to provide any further information about the Smith-related position(s) or their disposition.

30.    Following informal inquiries from Prophecy Fund investors, including Plaintiffs, ████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██

D.   ██████████████████████████████████████
     ████████████████████

31.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

32.   Despite Plaintiffs requests, Prophecy has refused to share ████████████████████████████████ Likewise, Prophecy has refused to share ████████████████████████████ with Plaintiffs.

33.   There is good reason, however, to doubt that ████████████████ ████████████████████████████████████

34.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

11

35.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

36.   As of the date of this Complaint, however, ████████████

████████████████   Accordingly, Prophecy Fund investors, like Plaintiffs, have no

reliable information concerning the Prophecy Funds' financial condition in 2018,

2019 or 2020.

E.   ████████████████████████████████████████

37.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

38.   Prophecy GP, together with the Trading Advisors Fund's investment

manager, ██████████████████████████████████████████

████████████████████

12

39.    As part of this work, Plaintiffs learned that ███████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████    At a minimum, this fact raises serious

questions concerning potential mismanagement by Trading Advisors GP and

Spotts, given the obvious violations of applicable risk and concentration limits in

the Trading Advisors Fund. It also raises questions about the earlier transaction(s)

in which ████████████████████████████████████
████████████████████████

40.    Weeks later, in or about May 2020, Jeffrey Spotts, as the manager and

owner of Special Ops GP, ███████████████████████████
███████████████████████    IDARF, despite being a limited

partner in Special Ops Fund, received no formal notice of this action by Special

Ops GP, let alone any explanation of the circumstances surrounding the decision.

F.    ████████████████████████████
█████████

41.    Upon information and belief, ███████████████████
███████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

42.     Plaintiffs further understand from limited discussions with Jeffrey

Spotts that, ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████

43.     Despite repeated inquiries by Plaintiffs to Prophecy Funds and

Prophecy GPs concerning ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ Plaintiffs have little to no information

concerning the state of the Prophecy Funds' investments.

44.     Instead, Prophecy Funds, Prophecy GPs and Spotts have offered, at

best, shifting explanations, many of which were undermined by subsequent events.

For instance, following the precipitous downturn in the markets in March 2020,

Spotts informed First Landing that ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

14

███████████████████████████████████████████████

███████████████████████████████████████████████

45.     Moreover, Prophecy Funds investors have not received any financial

reporting on the Prophecy Funds since February 2020.  Indeed, upon information

and belief, Plaintiffs understand that ████████████████████████████████

████████████████████████████████████████████████

G.      ████████████████████████████████████

46.     Indeed, Plaintiffs understand that, on or about May 27, 2020,

████████████████████████████████████████████████

███████████████████████████████████

47.     During informal discussions with Plaintiffs, Jeffrey Spotts revealed

that, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

48.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

15

████████████████████████████████████████████

██████████

49.     To date, however, as described herein, Prophecy Funds investors have received no substantive information, notwithstanding their various requests for information to Jeffrey Spotts, both informal and formal.

H.     Plaintiffs' Requests for Information and Demand for Books and Records

50.     In the months preceding Plaintiffs' formal demands for inspection of books and records, Plaintiffs have repeatedly requested information from Defendants informally to no avail.

51.     For instance, ████████████████████████████████ IDARF engaged in back-and-forth conversations with Defendants concerning information regarding Brenda Smith, Sub-Advisor #1 and the financial status of the Prophecy Funds.  These conversations were plagued by telephone calls delayed at the last minute, repeated excuses and limited, vague discussions around the topics of information sought by IDARF.

52.     Likewise, First Landing engaged in numerous telephone calls and countless e-mail exchanges with Defendants concerning information about the Prophecy Funds and their investments, only to receive no concrete responses and, in most cases, only further delay and excuses.  In some cases, both IDARF and

First Landing jointly participated in calls to request information, but obtained no different response from Defendants.

53.     Despite multiple, informal requests for books and records of the Trading Advisors Fund and Special Ops Fund, only limited, incomplete—and often contradictory—information was provided to IDARF under an onerous non-disclosure agreement, and no such materials of any kind were ever provided or made available for inspection and copying by First Landing.  Indeed, for instance, during these informal requests, Defendants' responses varied substantially with regards to the nature and extent of Sub-Advisor #1's relationship with the Prophecy Funds, leaving Plaintiffs to wonder what relationships Sub-Advisor #1 has with the Prophecy Funds and their terms, only underscoring Plaintiffs' need for information in response to their requests.

54.     Accordingly, on June 11, 2020, First Landing served a demand on Trading Advisors GP seeking to inspect the books and records of Trading Advisors Fund, a true and correct copy of which is attached as Exhibit G.  A courtesy copy of this demand was sent via e-mail to Jeffrey Spotts (owner and manager of Trading Advisors GP) and his counsel, Morgan Lewis and Bockius, LLP on June 11, 2020.  The demand was delivered via certified mail, return receipt requested (7019 1640 0000 0415 5252) on June 15, 2020.

55.     IDARF likewise served demands on Trading Advisors GP and Special Ops GP seeking to inspect the books and records of Trading Advisors Fund and Special Ops Fund, true and correct copies of which are attached as Exhibit H.  A courtesy copy of this demand was sent via e-mail to Jeffrey Spotts (owner and manager of Prophecy GPs) and his counsel, Morgan Lewis and Bockius, LLP, on June 11, 2020.  The demands were delivered via certified mail, return receipt requested (7019 1640 0000 0415 5245 and 7019 1640 0000 0415 5269) on June 15, 2020 (together, the June 11, 2020 demand letters served by First Landing and IDARF are referred to as the "Initial Demands").

56.     The Initial Demands served on Trading Advisors GP and Special Ops GP all sought:

- Organizational documents of Trading Advisors Fund and Special Opportunities Fund, including those relating to the reorganization of Prophecy in 2018;

- Meeting minutes and resolutions of the General Partner and Manager relating to the management of Trading Advisors Fund and Special Opportunities Fund;

- All financial statements (audited or unaudited) for the Funds;

- All monthly statements for each sub-advisory account in Trading Advisors Fund and Special Opportunities Fund;

- The general ledgers of Trading Advisors Fund and Special Opportunities Fund, and supporting documents for any disbursements;

- Federal tax filings for Trading Advisors Fund and Special Opportunities Fund for 2017 and 2018;

18

- All due diligence conducted by the General Partner and Manager concerning Brenda Smith, Broad Reach Capital, LP, Broad Reach Partners, LLC, and Bristol Advisors, LLC (all such entities, individually and collectively, and together with Smith individually, are hereinafter referred to as "Smith");

- All investment management agreements or sub-advisor agreements between the General Partner and/or Manager, on the one hand, and Smith, on the other;

- All communications concerning or relating to Smith since September 2018;

- All documents relating to the termination of Smith's relationship with the Funds;

- All documents relating to the sale of Smith's debt;

- A profit and loss statement for each account owned, operated or managed by Smith in connection with Trading Advisors Fund or Special Opportunities Fund;

- All documents relating to any analysis or investigation conducted by the General Partner or Manger concerning Smith;



- The Manager's Compliance Manual, including any exhibits or other documents referenced in the Compliance Manual, for the period 2017 to present, including any different versions or iterations of the Compliance Manual during that time period;

- Documents sufficient to establish the General Partner and Manager's policy or policies concerning risk or concentration limits in Trading Advisors Fund or Special Opportunities Fund, including any changes to such policy or policies;

- Communications by General Partner or Manager or Audit Committee with Deloitte concerning the preparation of 2017, 2018, and 2019 audited financial statements and ███████████████████████████ ███████████████████████████

- All SEC filings regarding ███████████████████

- All public announcements or communications with Limited Partners concerning ██████████████████

- All reports issued by Deloitte relating to 2017 or 2018 audits, including Management Letters, Governance Letters, Engagement Letters, and Representation Letters;

- Deloitte's engagement letter ████████████████████████ ████████████████████████████████

- All invoices from Deloitte to Trading Advisors Fund and Special Opportunities Fund from 2017 to present;

- Minutes of Audit Committee Meetings for 2017 to present;

- All investment management agreements or sub-advisor agreements between the General Partner or Manager and Sub-Advisor #1 or entities owned, operated or managed by Sub-Advisor #1 (all such entities, individually and collectively, and together with Sub-Advisor #1 individually, hereinafter are referred to as "Sub-Advisor #1");

- All due diligence conducted by the General Partner or Manager concerning Sub-Advisor #1;

20

- All agreements or other documentation regarding any assets, including publicly-traded securities, purchased by Sub-Advisor #1 relating in any way to the Funds;

- All communications between the General Partner or Manager and Sub-Advisor #1 relating to the investment management agreements referenced in the immediately preceding paragraph;

- All documents comprising any guarantee by Sub-Advisor #1 in connection with accounts in Trading Advisors Fund or Special Opportunities Fund;

- All communications with Sub-Advisor #1 or his agents or representatives in connection with any guarantee;

- Documents sufficient to identify any collateral pledged by Sub-Advisor #1 in connection with any accounts in Trading Advisors Fund or Special Opportunities Fund;

- All communications with Sub-Advisor #1 or his agents or representatives in connection with any such collateral pledged by Sub-Advisor #1;

- Documents sufficient to identify any cross-trades between or amongst accounts in Trading Advisors Fund or Special Opportunities Fund;



and

██████████████████████████████

- All subpoenas, requests for information, and responses thereto between Trading Advisors Fund, Special Opportunities Fund, the General Partner or the Manager and any State or federal agency.

57.    The demands were served to pursue Plaintiffs' proper purposes relating to their roles as limited partners.  Specifically, the demand recited that they were made for the following purposes:

- To investigate potential wrongdoing or mismanagement by the Funds, their General Partners or Managers in connection with Smith's involvement with the Funds;

- To investigate potential wrongdoing or mismanagement by the Funds, their General Partners or Managers in connection with Sub-Advisor #1's involvement with the Funds;

- To investigate the impact of ██████████████████████████████ and

- To investigate claims that may be made by or against the Funds arising out of the foregoing.

58.    Each of the demands requested, as provided by Section 17-305(e), a response within five (5) business days.

59.    On June 18, 2020, Defendants' counsel responded to Plaintiffs' Initial Demands via email, permitting Plaintiffs to receive copies of the Limited Partnership Agreements and their amendments *provided Plaintiffs execute a confidentiality agreement* and otherwise contending that the demands "fail[] to

22

satisfy the legal requisites of a proper purpose to warrant further inspection."  True and correct copies of Defendants' response to the demands is attached hereto as Exhibit I.

60.   On June 26, 2020, Plaintiffs commenced this action, seeking inspection of Defendants' books and records on an expedited schedule .  In opposition to Plaintiffs' Motion to Expedite, Defendants argued that the June 11, 2020 Initial Demands failed to include sufficient factual detail outlining Plaintiffs' credible basis to suspect potential mismanagement or wrongdoing..

61.   While Plaintiffs disagree with Defendants arguments, in order to avoid unnecessary litigation over the collateral issue of whether the Initial Demands provide enough factual detail concerning Plaintiffs' credible basis, on July 10, 2020, Defendants served[2] supplemental demand letters, explaining in detail their credible bases to investigate potential mismanagement and wrongdoing by Defendants.  True and correct copies of these demand letters from First Landing and IDARF to Defendants are attached as Exhibit J and Exhibit K, respectively

---

[2]   Service of the July 10, 2020 demand letters was effected pursuant to the Limited Partnership Agreements by sending copies to the General Partners' notice addresses via certified mail, return receipt requested – tracking numbers 7019 1640 0000 0411 1722, 7019 1640 0000 0411 1739 and 7019 1640 0000 0411 1555.  A copy of the demand letters was also provided to Defendants' counsel via e-mail.

(together, the July 10, 2020 supplemental demand letters served by First Landing and IDARF are referred to as the "Supplemental Demands").

62.    The Supplemental Demands are identical to the Initial Demands, except that the Supplemental Demands incorporated language from the Complaint and Motion to Expedite describing Plaintiffs' credible basis to suspect wrongdoing or mismanagement by Defendants, of which the Defendants were already aware.

63.    On July 16, 2020, Defendants' counsel requested from Plaintiffs' counsel a one week extension of time to respond to the Supplemental Demands. When Plaintiffs declined to agree to extend the statutory deadline, Defendants counsel indicated that Defendants would not respond within the five business day response deadline under Section 17-305.

64.    Plaintiffs did not respond to the July 10, 2020 Supplemental Demands within five business days of their service.

65.    Defendants' failure to honor the demands is a violation of Section 17-305.

24

**Request for Relief Under 6. *Del. C.* § 17-305**
**(against Prophecy GP and Prophecy Fund by all Plaintiffs)**

66.    Plaintiffs incorporate paragraphs 1 through 48 as if set forth fully herein.

67.    Plaintiffs are and have been at all relevant times limited partners of Prophecy Fund.

68.    Pursuant to Section 17-305, Plaintiffs have the right upon reasonable demand to obtain "true and full information regarding the status of the business and financial condition of the limited partnership," and "other information regarding the affairs of the limited partnership as is just and reasonable." 6 *Del. C.* § 17-305(a)(1) and (6).

69.    Further, Section 5.04 of the Trading Advisors Fund Partnership Agreement provides, in relevant part,

> Upon reasonable advance notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained under Section 17-305 of the Act and any financial statements maintained by the Partnership.

Exhibit A, Section 5.04.

70.    On June 11, 2020, Plaintiffs served their demand letters on Trading Advisors GP for the inspection of the books and records of Trading Advisors Fund,

attaching to each a notarized power of attorney authorizing Pryor Cashman LLP to act on Plaintiffs' behalf in pursing the demands.

71.    On July 10, Plaintiffs served the Supplemental Demands on Trading Advisors GP for the inspection of the books and records of Trading Advisors Fund, attaching to each a notarized power of attorney authorizing Pryor Cashman LLP to act on Plaintiffs' behalf in pursing the demands.

72.    Plaintiffs have complied with the requirements of Section 17-305 with respect to the form and manner of their demands on Trading Advisors Fund for inspection and copying of Trading Advisors Fund's books and records as set forth in their June 11, 2020 and July 10, 2020 demands and herein.

73.    Defendants Trading Advisors GP and Trading Advisors Fund have wrongfully refused to honor Plaintiffs' June 11, 2020 and July 10, 2020 demands.

### Request for Relief Under 6. *Del. C.* § 17-305
### (against Special Ops GP and Special Ops Fund by IDARF)

74.    IDARF incorporates paragraphs 1 through 65 as if set forth fully herein.

75.    IDARF is and has been at all relevant times a limited partner of Special Ops Fund.

76.    Pursuant to Section 17-305, IDARF has the right upon reasonable demand to obtain "true and full information regarding the status of the business

26

and financial condition of the limited partnership," and "other information regarding the affairs of the limited partnership as is just and reasonable." 6 *Del. C.* § 17-305(a)(1) and (6).

77.     Further, Section 5.04 of the Special Ops Fund Partnership Agreement provides, in relevant part,

> Upon reasonable advance notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained under Section 17-305 of the Act and any financial statements maintained by the Partnership.

Exhibit D, Section 5.04.

78.     On June 11, 2020, IDARF send its demand letter to Special Ops GP to inspect the books and records of Special Ops Fund, attaching to it a notarized power of attorney authorizing Pryor Cashman LLP to act on IDARF's behalf in pursing the demand.

79.     On July 10, 2020, IDARF sent its Supplemental Demand letter to Special Ops GP to inspect the books and records of Special Ops Fund, attaching to it a notarized power of attorney authorizing Pryor Cashman LLP to act on IDARF's behalf in pursing the demand.

80.     IDARF has complied with the requirements of Section 17-305 with respect to the form and manner of its demands on Special Ops Fund for inspection

and copying of Special Ops Fund's books and records as set forth in its June 11, 2020 and July 10, 2020 demands and herein.

81.    Defendants Special Ops GP and Special Ops Fund have wrongfully refused to honor IDARF's June 11, 2020 and July 10, 2020 demands.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

A.    Entering judgement in favor of Plaintiffs and against Defendants;

B.    Declaring that Plaintiffs' demand letters complied with the requirements of Section 17-305;

C.    Summarily ordering Prophecy GP and Trading Advisors Fund to provide the books and records identified in Plaintiffs' demand letters for inspection and copying within five (5) business days of the Court entering judgment in this action;

D.    Summarily ordering Special Ops GP and Special Ops to provide the books and records identified in IDARF's demand letter for inspection and copying within five (5) business days of the Court entering judgment in this action;

E.    Summarily ordering Defendants to provide a log of all documents withheld on any claim of privilege or immunity from production and retaining jurisdiction to consider any challenge to those assertions of privilege or immunity from production;

28

F.      Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, costs, and expenses; and

G.      Awarding such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP

OF COUNSEL:

E. Scott Schirick (admitted *pro hac vice*)
Marion R. Harris (admitted *pro hac vice*)
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100

July 22, 2020

*/s/ R. Judson Scaggs, Jr.*
R. Judson Scaggs, Jr. (#2676)
Aubrey J. Morin (#6568)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2020 the foregoing was caused to

be served upon the following counsel of record via File & Serve*Xpress*:

        Jody C. Barillare, Esquire
        Morgan, Lewis & Bockius LLP
        1007 North Orange Street, Suite 501
        Wilmington, DE  19801

                                       */s/ Aubrey J. Morin*
                                       Aubrey J. Morin (#6568)